UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COLUMBIA MACHINE, INC., a
Washington corporation,

                    Plaintiff,

        v.

BESSER COMPANY, a Michigan
corporation, and BESSER COMPANY
USA, a Michigan corporation,

                    Defendants.

CASE NO. C10-5667RBL


ORDER CONSTRUING
CLAIM TERMS

        This matter comes before the Court pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), to construe the disputed claim terms of United States Patent No. 5,807,691 (the "'691 Patent"), United States Patent No. 6,177,039 (the "'039 Patent"), and United States Patent No. 6,352,236 (the "'236 Patent"). The Court has reviewed the parties' opening, responsive, and supplemental briefs, heard oral argument of counsel, and considered the remainder of the file.

## I. PROCEDURAL HISTORY

        On September 17, 2010, Plaintiff Columbia Machine, Inc. ("Columbia"), filed a complaint for patent infringement against Defendant Besser Company. Dkt. 1. On February 17, 2012, Columbia filed a second amended complaint for patent infringement

ORDER - 1

1    against Defendants Besser Company and Besser Company USA (collectively "Besser").

2    Dkt. 133.

3         On March 8, 2012, the parties filed their opening claim construction briefs.  Dkts.

4    139 (Besser) & 141 (Columbia).  On March 13, 2012, both parties responded.  Dkts. 147

5    (Besser) & 148 (Columbia).  On March 20, 2012, the Court held status conference and

6    allowed the parties to submit additional claim construction briefing.  *See* Dkt. 153.  On

7    April 5, 2012, Columbia filed a supplemental brief.  Dkt. 158.  On April 10, 2012, Besser

8    filed a supplemental brief.  Dkt. 161.

9         On April 13, 2012, the Court held a technology tutorial and claim construction

10   hearing.  *See* Dkt. 163.

## II.  PATENTS

12        The '591 Patent and the '236 Patent are entitled "Method and Apparatus for

13   Forming Concrete Products," and the '039 Patent is entitled "Method for Forming

14   Concrete Products."  Each patent specification contains an introductory paragraph that

15   provides as follows:

16             This invention relates generally to cement product making
               machinery and more particularly to a method and apparatus for high speed
17             manufacturing of a wide variety of high quality products.

18   *See, e.g.*, '591 Patent, col. 1, ll. 8-11.

## III.  DISCUSSION

21   **A.    Legal Standard**

22        The claims of the patent establish and limit the patentee's right to exclude by

23   "describing the outer boundaries of the invention."  *Warner-Jenkinson Co., Inc. v. Hilton*

24   *Davis Chem. Co.*, 520 U.S. 17, 27 n. 4 (1997).  It is the obligation of the court to construe

25   as a matter of law the meaning of language used in the patent claims.  *Markman*, 52 F.3d

26   at 979.  In construing a patent's claim terms, a court must consider the intrinsic evidence

27   in the record.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).  Intrinsic

evidence includes the ordinary and customary meaning of the claim terms, the specification of the patent, and the patent's prosecution history. *Id.*

The ordinary and customary meaning of a term is defined by a person of ordinary skill in the art at the time of the invention. *Id.* The context in which a term is used can be "highly instructive" in resolving the meaning of the term. *Id.* at 1314. For example, if a claim has the term "steel baffle," it strongly implies that the term "baffle" does not inherently include objects made of steel. *Id.* Other claims in a patent may also provide valuable contextual cues for deciphering the meaning of a term. *Id.* If a limitation is present in a dependent claim, then there is a presumption that the limitation is not present in the parent claim. *Id.* at 1314-15.

The claims must also be read in light of the specification. *See Markman*, 52 F.3d at 979. The specification is always highly relevant to the meaning of a claim term: "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). If the specification reveals a definition of a claim term that is different from how that term would otherwise be used, then "the inventor's lexicography governs." *See Phillips*, 415 F.3d at 1316. The court should take care, however, not to import limitations from the specification into the claims. *Id.* at 1323. For example, even if the specification describes very specific embodiments, the claim terms should not be confined to those embodiments. *Id.*

The prosecution history of a patent is the last piece of intrinsic evidence that a court should consider when construing the claims of the patent. *Id.* at 1317. The prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Id.* A court, however, should be aware that the prosecution history represents the ongoing negotiation between the PTO and the applicant, rather than the final product. *Id.* As such, the prosecution history

may lack the clarity of the specification and may not be as useful for claim construction purposes. *Id*. In certain instances, however, the prosecution history may provide guidance of an applicant's intent to specifically limit the scope of a given claim term. *Id*.

Extrinsic evidence is the last category of evidence a court may consider when construing patent claims. *Id*. Such extrinsic evidence includes expert and inventor testimony, dictionaries, and learned treatises. *Id*. On its own, extrinsic evidence is unlikely to be reliable in guiding the court's claim construction. *Id*. at 1319. Instead, extrinsic evidence should be considered in the context of the intrinsic evidence. *Id*. A court may also use extrinsic evidence to determine how a person of ordinary skill in the art would understand the claimed invention. *Id*.

Although it is the court's duty to resolve fundamental disputes among the parties as to the scope of a claim term, it is not the court's duty to construe every claim term, or to repeat or restate every claim term. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *02 Micro Int'l Ltd. v. Beyond Innovation Tech Corp.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F. 3d at 1312 (citing *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

With these standards and rules in mind, the Court turns to both the agreed terms and the disputed terms of the patents in question.

**B.      Agreed Terms**

In this case, the parties have agreed to the construction of three claim terms, and Besser has conceded any dispute as to a fourth term.  The three agreed terms and constructions are as follows:

1.      concrete products forming machine - a machine that forms or makes concrete products;

2.      forming cavities - a front and back wall joined together with side walls within which cavities are formed; and

3.      align - to adjust to produce a proper relationship or orientation.

Dkt. 68 at 2.  The parties also agree that variations of the above terms incorporate the agreed meanings.  Dkt. 141 at 6.  For example, claim 1 of the '039 patent refers to a "products forming machine," which is simply shorthand for "concrete products forming machine."  *Id.*

With regard to Besser's concession, Columbia initially asserted that the parties disputed the term "mold box" and proposed that the Court construe the term to mean "a device having a mold assembly and a head assembly."  Dkt. 139 at 6.  In its opening claim construction brief, Besser conceded that, although the claim terms "mold box" and "mold assembly" were not used "in their normal industrial sense," the patents "unambiguously use the term 'mold box'" in such a way as to "always include a mold assembly and head assembly."  Dkt. 141 at 7.  Therefore, because the parties no longer dispute the construction of the term "mold box," the Court construes "mold box" to mean "a device having a mold assembly and a head assembly."

**C.      Disputed Terms**

The parties dispute eight terms that are contained in the patents in suit.  *See* Dkt. 161 at 2-3.  Six of the terms are independent of the other disputed terms, while two of the disputed terms may be addressed together.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1.     "side walls"

Claim 1 of the '591 Patent and claims 1 and 4 of the '236 Patent contain the term "side walls."   Columbia proposes that the Court construe the term to mean "components of a mold assembly that join together a front wall and a back wall."  Columbia has consistently offered this proposed construction.  *See* Dkts. 68 at 9 & 158 at 10.  On the other hand, Besser has asserted different positions on this term in each brief submitted to the Court.  Besser originally proposed that the side walls "are the mold assembly walls that run along the sides of the machine and that form one or more cavities with the front and back walls." Dkt. 68 at 15.  Then, Besser asserted that "Columbia appears to want to argue what a 'side wall' is.  There is no ambiguity in that regard." Dkt. 141 at 7.  Next, in an effort to prevent Columbia from broadening "its definition simply to sue competitors," Besser requested that "the Court clarify that the side wall must itself function to 'form one or more cavities' for forming cement (sic) . . . ." Dkt. 147 at 3-5.  Finally, in its supplemental brief and at the claim construction hearing, Besser proposed that the Court construe the term "side wall" to mean "mold assembly walls that run along the sides of the machine, forming one or more cavities with the front and back walls, and not other structures extending from or removed from the said walls."  Dkt. 161 at 2.

At this point, Besser has failed to show that there exists any ambiguity as to the term "side wall."  In fact, Besser's final proposed construction appears to be based more on an infringement analysis as opposed to the Court's current directive, which is to construe "the meaning of language used in the patent claims." *Markman*, 52 F.3d at 979. As set forth in its briefing and at oral argument, Besser is concerned that Columbia will assert that the scope of the patents contains a mold assembly wherein the components used to join the front and back walls are separate and somehow attached to components that align and secure the mold assembly to the frame of the machine.  While it is true that, to overcome prior art,  Columbia disclaimed the use of support brackets attached to the

side walls of the mold assembly (Dkt. 143, Declaration of Thomas Skunk ("Skunk Decl."), Exh. H.), the necessary alignment and support limitations of the side walls are clearly set forth in other parts of the asserted claims.  In other words, construing "side wall" as Besser proposes would simply be restating limitations that are explicitly already present in the asserted claims.  Therefore, the Court declines to adopt Besser's proposed construction regarding the structure of the side walls.

With regard to the issue of cavities, there is no support in the intrinsic evidence for the limitation that the side walls must be construed to "form one or more cavities with the front and back walls."  In fact, it would be redundant and nonsensical to adopt Besser's proposed construction of side wall, which requires forming cavities, in addition to its agreed upon construction of forming cavities, which requires the joining of walls to form cavities. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (Claim construction "is not an obligatory exercise in redundancy."); *AIA Engineering Ltd. v. Magotteaux Intern. S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011) ("We strive, where possible, to avoid nonsensical results in construing claim language.") (citing *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1370 (Fed. Cir. 2008)).

With regard to Columbia's proposed construction, it is supported by the surrounding claim language, the intrinsic evidence, and the ordinary meaning of side wall.  *See, e.g.*, Skunk Decl., Exh. H.  The Court, however, finds no support for the request to construe the term "wall" to mean the broader term "component."  Therefore, the Court construes the term "side walls" to mean "walls of a mold assembly that join together a front wall and a back wall."

2.    **"allowing"/"directly"**

Claim 1 of the '591 Patent and claim 4 of the '236 Patent contain the following phrase "the front and back walls of the mold assembly sized for bridging across a pair of

shelves on a concrete product forming machine allowing the side walls to sit directly on top of the shelf." The parties dispute involves the smaller phrase "allowing the side walls to sit directly on top of the shelf" and the meaning of terms "allowing" and "directly."

The resolution of this dispute involves construing only the term "allowing." Even if the Court were to construe the phrase "to sit directly on top of" to require physical contact between the assembly and the shelves, the proper construction of "allowing" conveys that the contact is permissive, not required. On this issue, Besser argues that if "allowing" is construed as a permissive limitation, then the Court would violate the cannon of claim construction that the Court "must give meaning to all the words in [the] claims . . . ." Dkt. 161 at 16-17 (citing *Ethicon Endo-Surgery v. United States Surgical Corp.*, 93 F.3d 1572, 1582-83 (Fed. Cir. 1996)). The term, however, is a necessary limitation as to the preceding language, namely the horizontal length of the front and back walls.

In this case, the context of the claim language is the best guide for construing "allowing." The relevant portion of the claim begins with walls that are "sized for" extending from shelf to shelf and allowing the side walls to physically sit on top of each shelf. Construing "allowing" as "requiring" would shift the focus of the claim from the length of the front and back walls to the orientation between the side wall and shelves. This would be improper and redundant because the orientation limitation is set forth in the next phrase of the claim that discloses the alignment objects on the shelves and in the side walls.

With regard to the specification, the specific embodiment clearly shows that the side wall physically contacts the shelf. However, importing this limitation into the claim language and altering the ordinary and customary meaning of "allowing" violates established canons of claim construction. *See Phillips*, 415 F.3d at 1316 (The court should take care to import limitations from the specification into the claims).

With regard to the prosecution history, in overcoming a rejection, Columbia argued that the side walls "sit directly on opposite shelves."  Skunk Decl., Exh. H. at 3–4.

The argument was presented to overcome prior art that disclosed supporting the mold assembly with flanges because the front and back walls were sized so that the side walls were within the gap between the opposing shelves.  *Id*.  The current invention teaches to increase the length of the front and back walls such that there is no need for support flanges.  *Id*.  This negotiation with the examiner provides no guidance on the issue of whether "allowing" was intended to be understood as permissive.

Therefore, the Court finds that the intrinsic evidence supports Columbia's proposed construction and "allowing" is construed as "permitting, but not requiring."

**3.      "supporting"**

Claim 1 of the '236 patent contains the phrase "supporting the mold assembly on the shelves so that the alignment dowels are received within the die alignment holes." The parties dispute the meaning of "supporting."

Although both parties agree that "supporting" means "bear the weight of," Besser contends that this requires direct physical contact between the side walls and the shelves. Dkt. 161 at 14-16.  The Court disagrees.  The claim language provides that the alignment limitations must still be met whether the assembly is in physical contact with the shelves or whether some other structure intervenes, such as a shim.  For example, the alignment dowels on the shelves must be received by the alignment holes in the side walls.  '236 Patent, col. 15, ll. 38–40.

With regard to the specification, the Court will not import the embodiment disclosed in the figures into the claim language.  *Phillips*, 415 F.3d at 1316.  Therefore, the Court rejects Besser's proposed construction that writes physical contact into the meaning of "supporting" because it is not supported by the intrinsic evidence.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   4.     "alignment holes"/"alignment dowels"

   Claim 1 of the '591 Patent and claim 4 of the '236 patent contain the phrase

"alignment holes extending up from a bottom side end for slidingly receiving alignment

dowels extending up from the shelves," and claim 1 of the '236 Patent contains the phrase

"aligning the bottom-facing die alignment holes with the upwardly extending alignment

dowels."  Besser requests that the Court construe the term "alignment holes" to be

physically located in the bottom of the side walls (Dkt. 141 at 9), and the parties dispute

the three-dimensional shape of the alignment objects.

   First, the claims explicitly limit the location of the alignment holes.  For example,

claim 1 of the '236 Patent provides that "said side walls having die alignment holes

formed on the bottom-facing surface thereof . . . ."  '236 Patent, col. 15, ll. 32–33.  The

Court need not construe terms to repeat disclosed limitations. *02 Micro*, 521 F.3d at

1362.

   Second, Besser contends that a person of ordinary skill in the art would interpret

the term "dowel" to be an "untapered, cylindrical pin" and that the hole would have a

corresponding shape for "flush contact" between the pin and hole.  Dkt. 161 at 17-18.  In

support of this contention, Besser directs the Court's attention to component number 101

depicted in Figure 7 of both patents, which is a two-dimensional square object.  Even if

the Court imported this limitation from the specification into the claims, the limitation

would at most only require that the dowel be square shaped from this particular

viewpoint.  This limitation would not prevent the dowel from being tapered into or out of

the page, essentially in the third-dimension of component 101 that is not disclosed in any

other figure.  Therefore, the Court declines to adopt Besser's proposed construction as to

the specific shape of the dowel.

   With regard to Columbia's position, Columbia proposes that the Court adopt the

term "element," which excludes any shape characteristics associated with the term

"dowel." The intrinsic evidence does not support such a broad construction. Moreover, Columbia fails to provide any argument that the inventors were acting as their own lexicographer when using the term dowel. Turning to the extrinsic evidence, Columbia offer the definition that a "dowel" is "a usually round pin that fits tightly into a corresponding hole to fasten or align two adjacent pieces." Dkt. 68 at 10 (citing *The American Heritage College Dictionary* (4th Ed. 2007)). This is in an acceptable definition with the exception of the "fasten" reference and the word "adjacent." "Fasten" should be excluded because the dowels in this invention are clearly used only for alignment purposes and are even referred to as "alignment dowels." "Adjacent" should be excluded because the Court has determined that the mold assembly need not directly contact the shelves. Therefore, the Court construes the term "alignment dowel" to mean "a usually round pin that fits tightly into a corresponding hole to align two pieces."

With regard to the term "alignment hole," the Court finds that the characteristics of the hole is a necessary consequence of the construction of "alignment dowel." For example, if the dowel must fit tightly into the corresponding hole, the hole and the dowel must have mating shapes. Therefore, the Court declines to adopt any additional construction for the term "alignment hole."

### 5.      "thereby holding . . . before bolting'

Claim 1 of the '591 Patent and claims 1 and 4 of the '236 Patent contain the phrase "thereby holding the mold assembly in a prealigned position before bolting the mold assembly to the shelves." Columbia presents two separate arguments for why this phrase should not be construed as a claim limitation. First, in *Texas Instruments v. United States Int'l Trade Comm'n*, the Federal Circuit held that "a 'whereby' clause that merely states the result of a limitation in the claim adds nothing to the patentability or substance of the claim." 988 F.2d 1165, 1172 (Fed. Cir. 1993) (citing *Israel v. Cresswell*, 35 C.C.P.A.

1  890, 166 F.2d 153, 156 (C.C.P.A.1948)).  That is because stating the result of an

2  invention in a patent does not affect its patentability.  *Israel*, 166 F.2d at 156.

3      In this case, Columbia argues that the "thereby" clause merely states the result of

4  previous limitations in the claims.  Dkt. 139 at 13-14.  Similar to the claim terms at issue

5  in *Texas Instrument*, the thereby clause in the instant claims appears to recite the physical

6  result of arranging the components of the claims in the manner recited in the claims.  *See*

7  *Texas Instruments*, 988 F.2d at 1172.  For example, the claims disclose using the

8  alignment objects to  arrange components in a "prealigned position."  This interpretation

9  comports with an object of the invention to "reduce the amount of time required to

10 exchange and align molds . . . ."  '591 Patent, col. 2, ll. 23–24.  If the instant phrase only

11 disclosed alignment characteristics, it would appear that a person of ordinary skill in the

12 art would not consider the phrase to be an actual limitation of the claimed invention.  The

13 phrase, however, also discloses the attachment characteristics "before bolting the mold

14 assembly to the shelves," which cannot be ignored.  *See Exxon Chemical Patents, Inc. v.*

15 *Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) (recognizing that the court "must

16 give meaning to all the words in [the] claims").

17     Columbia argues that the use of the term "before" references a specific state in

18 time prior to the attachment of the mold assembly to the shelves.  Dkts. 139 at 14, 148 at

19 6, & 158 at 25-29.  This would be a persuasive argument if the claims contained the terms

20 "attached" or "secured."  Instead, the inventors choose to use the term "bolting" in both

21 the specification and the claims.  One of ordinary skill in the art would understand the

22 scope of the claim, at least on the issue of attachment, to be limited to the preferred

23 embodiment described in the specification.  *See, e.g.*, '236 Patent, col. 9, ll. 1–3. ("Dowel

24 101 allows each mold assembly, such as mold assembly 86 to be prealigned and **bolted** in

25 the same position on shelf.") (emphasis added).  The Court is mindful that it should take

26 care not to import limitations from the specifications into the claims.  *Phillips*, 415 F.3d at

1  1323.  However, with regard to the term "bolting," the inventors imported the limitation,
2  not the Court.

3          In the event the Court found that bolting was a limitation, Columbia argues that the
4  inventors, acting as their own lexicographers, intended "bolting" to be broadly interpreted
5  and "could readily be replaced with 'removably attaching' . . . ."  Dkt. 148 at 6-9.
6  Besides attorney argument, the only support for this proposition is a statement made to
7  the examiner in response to an office action.  Columbia stated that the mold assembly sits
8  "directly on opposite shelves for **attaching** to a concrete block forming machine."  Dkt.
9  143-8 at 4-5 (emphasis added).  While the prosecution history may provide guidance on
10 how the inventor understood the invention, it is not the final product and it lacks the
11 clarity of the specification.  *See Phillips*, 415 F.3d at 1317.  The Court is not persuaded
12 that a person of ordinary skill in the art would interpret bolting to mean readily attaching
13 based on this single broad reference in the prosecution history.  To the contrary, a person
14 of ordinary skill in the art would interpret bolting as it is ordinarily and customarily used.
15 The Court finds that Besser's proposed construction for the term "bolting" is the ordinary
16 and customary meaning.  Therefore, the Court construes "bolting" to mean "to fasten
17 using a bolt attached to some other threaded, mated object."

18          **6.      "locking"**

19          Claims 1 and 4 of the '039 patent contain the phrase "locking the feed drawer
20 assembly in the dispensing position."  The parties dispute the meaning of the term
21 "locking," and the central issue is whether merely stopping the vertical movement of the
22 feed drawer assembly falls within the scope of the term "locking."  The Court finds that
23 the context in which this term is used is "highly instructive" in resolving this dispute.
24 *Phillips*, 415 F.3d at 1313.

25          The second step of the disclosed method requires vertical movement of the feed
26 drawer assembly to a particular position.  '039 Patent, col. 15, ll. 31–33.  Moving an

object to a certain position implies that, once the desired position is reached, the movement is stopped.  If the movement is stopped, then there would be no need for the third step of the disclosed method, which is the "locking" step.  In this context, it appears that "locking" requires more than stopping the vertical movement.  Turning to the specification, the general description of the invention states that the "feed drawer assembly is **held** above the ground by telescoping legs . . .," and then a locking mechanism is employed "to lock each telescoping leg into a given vertical position . . . ." *Id*., col. 3, ll. 37–50.  The preferred embodiment also discloses the same "hold" then "lock" method.  *Id*., col. 9, ll. 40–59.  Specifically, the preferred embodiment provides that "[a]fter the feed drawer assembly is moved into the correct position . . . air locks are activated locking each telescoping leg in its present extended position."  *Id*., ll. 56–59. Therefore, the Court finds the "lock" step of the disclosed method requires more than merely stopping vertical movement or holding the assembly in the desired position.

With regard to the parties' proposed constructions, Besser's proposal of "immobilize" best conveys the idea of locking the assembly in the desired position. Columbia's proposal of using a "lock" is more succinct and direct than Besser's proposal of "engaging actively moving parts."  Columbia, however, also proposes that the term include the language "with or as if with," which the Court declines to adopt because the "as if" clause is unclear, ambiguous, and would reasonably include merely holding or stopping.  Therefore, combining relevant portions of the parties' proposals, the Court construes the term "locking" to mean "immobilizing with a lock component."

### 7.    "vertically moving the feed drawer assembly to a dispensing position"

Claim 1 of the '039 Patent contains the phrase "vertically moving the feed drawer assembly to a dispensing position . . . ."  Besser's position on this phrase has been somewhat of a moving target as it initially offered a proposed construction, then failed to

adequately address the issue in either its responsive or supplemental brief,[1] and then addressed the issue at the claim construction hearing.  Although Besser's proposed construction references movement "immediately" prior to the dispensing of concrete into the mold assembly, the real dispute between the parties is whether the "dispensing position" of the feed drawer assembly is a horizontal plane or a specific point in three dimensional space.

Besser contends that the limitations of vertically moving the assembly to a dispensing position and then locking it in the dispensing position requires vertical movement prior to reaching the dispensing position. Dkt. 141 at 21-22.  In other words, the dispensing position is a specific position in three dimensional space above the mold assembly.  On the other hand, Columbia contends that the dispensing position is a horizontal plane upon which the feed drawer assembly moves back and forth between the concrete feeder and the mold assembly to deliver concrete to the mold.  Dkt. 158 at 8 n. 1. Besser argues that construing the limitation to mean a horizontal plane "would be wholesale reconstruction of the claim on the scale of rebuilding postwar Dresden."  Dkt. 141 at 22.  It seems to be undisputed that the phrase may have been more clearly drafted. However, sticking with Besser's analogy, although some buildings may not have been engineered to withstand every conceivable attack, Besser's aerial raids have missed their mark and reconstruction is not necessary.

First, Columbia is not proposing a construction that contradicts any ordinary or customary meaning of the term "position."  For example, locking the assembly to a horizontal plane and referring to that plane as a "position" is not analogous to requesting the Court to construe "partially" to include "totally."  *See Helmsderfer v. Bobrick Washroom Equipment, Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("the ordinary and

---

[1] Although Besser requested a proposed construction in its supplemental brief, Besser failed to provide a substantive argument in support of its proposed construction. *See* Dkt. 161 at 3.

customary meaning of the term 'partially' excludes 'totally.'").  Therefore, one of ordinary skill in the are could construe the term "position" to be a "plane" without referring to the patentee as being his own lexicographer.

Second, the specification discloses both a "feed drawer assembly" (reference 14) and a "feed drawer" (reference 52).  During the "dispensing stage," a "piston 132 extends forward moving the feed drawer over the top of mold assembly" moving "concrete material . . . into mold assembly . . . ."  '036 Patent, col. 12, ll. 5-10.  In light of this intrinsic evidence, a person of ordinary skill in the art would understand the "dispensing position" to be the horizontal plane that the "feed drawer" moves laterally upon during the step of dispensing the concrete material into the mold assembly.

With regard to adopting any particular construction, resolving this dispute involved rejecting Besser's proposed construction rather than adopting Columbia's proposed construction.  The only portion of Columbia's proposed construction that does not repeat claim language is construing "vertically moving" to mean "moving perpendicular to the horizon."  This construction is consistent with the analysis above.  Therefore, the Court  "vertically moving" to mean "moving perpendicular to the horizon."

## IV.  ORDER

Therefore, it is hereby **ORDERED** that the disputed claim terms of the '691 Patent, the '039 Patent, and the '236 Patent are construed as set forth herein.

DATED this 20th day of April, 2012.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE